STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| In re: Fowler Subdivision & CU Permit | } | Docket No. 211-10-07 Vtec |

**Decision on Motion for Summary Judgment**

Appellant Mary Power appealed from a decision of the Town of Warren Development Review Board ("DRB") granting a subdivision and conditional use permit to Appellee-Applicant Bruce Fowler for the subdivision of Mr. Fowler's property along Senor Road.

Appellant is represented in these proceedings by Richard Johnston King, Esq.; Appellee-Applicant is represented by David T. Olenick, Esq. The Town of Warren has not entered an appearance.

Appellant has moved for summary judgment on Questions 2 and 5 from her Statement of Questions and asserts that if the Court grants her summary judgment request on either of those two Questions, the Court must also deny Mr. Fowler's pending subdivision and conditional use applications as a matter of law. Appellee-Applicant opposes Appellant's motion. Our review of the pending motion starts, as it must, with a review of the undisputed facts.[1]

**Factual Background**

1. Appellee-Applicant Bruce Fowler ("Applicant") owns a 4.9± acre parcel of land, located at 258 Senor Road in the Town of Warren. Applicant's property contains a residential duplex and is located in the Rural Residential Zoning District ("Rural Res. District"), with the western portion of the property located in the Meadowland Overlay Zoning District ("Meadowland District).[2]

2. Applicant's parcel has 247 feet of frontage on Senor Road. The existing duplex is accessed by a driveway leading from Senor Road. A man-made pond is located in the center of

---

[1] All facts recited or referenced here are undisputed unless otherwise noted. For purposes of the motion for summary judgment only, we view the material facts in a light most favorable to the non-moving parties. V.R.C.P. 56(c). We are not yet at the stage of making specific factual findings. Thus, our recitation here should not be regarded as factual findings. See Blake v. Nationwide Ins. Co., 2006 VT 48, ¶ 21, 180 Vt. 14, 24 (citing Fritzen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000)(mem.)).

[2] The parties provided the Court with a copy of the Town of Warren Land Use and Development Regulations ("Regulations"), last amended January 31, 2006.

the property. An un-named stream also crosses the property; it enters through a culvert in the northeastern section of the property, passes through a wooded section, passes over a meadow, and then exits at the southwestern corner of Applicant's parcel.

3. In March of 2007, Applicant submitted applications to the DRB for the permits necessary to subdivide his parcel into two lots. Applicant applied for a "minor" subdivision permit.[3] Because a portion of his property is located in the Meadowland District, Applicant concurrently applied for a conditional use permit.

4. As proposed, one 2.5± acre lot will retain the existing duplex and will have approximately 133 feet of road frontage on Senor Road ("Southern Parcel"). The second lot will contain 2.4± acres and a new four bedroom house with attached garage and will have approximately 114 feet of road frontage on Senor Road ("Northern Parcel"). Both parcels will be accessed by a new shared driveway, which will require a new curb cut on Senor Road.

5. Throughout April, May, July and August of 2007, the DRB held four duly warned hearings concerning Applicant's proposal.[4] In September of 2007, the DRB granted subdivision permit #2007-07-SD and conditional use permit #2007-07-CU. In the "Findings of Fact & Conclusions of Law" section, the DRB addressed, among other things, the issues of road frontage, the description and location of the interior stream, and the vegetative buffer along the stream.

6. On the issue of road frontage, the DRB asserted "that frontage can be figured along both the road and a right-of-way" and thus concluded that because "[t]he frontage requirement of 200 feet cannot be met entirely on Senor Road[, the road frontage] is being calculated using the 50-foot right-of-way for the shared access in addition."[5] Findings of Fact and Notice of Decision at 1-2.

7. During the hearings, the DRB also discussed whether the stream was either a natural or an artificially created waterway. Applicant's Engineer represented to the DRB that the water

---

[3] The subdivision will be a "minor" subdivision because the subdivision will contain only two lots. Regulations § 6.1(C)(1).

[4] In the Statement of Questions, the Appellant disputes the adequacy of the warnings for the hearings but does not raise that issue in her pending motion.

[5] Regulations Table 2.2 requires a minimum lot frontage of 200 feet.

course was depicted on a United States Geological Survey ("USGS") map. It is therefore classified as a "stream" under Regulations § 10.2.[6]

8. The DRB recognized that the proposed house on the Northern Parcel would encroach upon the stream's fifty foot vegetated buffer, as set forth in Regulations § 3.13(A). Applicant's Engineer invited the State Stream Alteration Engineer to survey the stream. The State Engineer purportedly represented during the DRB review that, regardless of the stream's formation, the State "did not have any jurisdiction over [the stream] but that he would have no problem in moving it if [the State] did have jurisdiction." Id. at 2. Subsequently, the DRB allowed Applicant to modify the site plans so that the stream was relocated in an arc to the north, away from the proposed house on the Northern Parcel, so that the proposed structure could respect a fifty-foot vegetated buffer from the relocated stream. The building envelope for the proposed house on the Northern Parcel was also reformatted to respect the vegetated buffer. Id. at 2-3. Neither party submitted any documentation from the State evidencing a jurisdictional or permit determination concerning the relocated stream.

9. The DRB approved Applicant's site plan, last revised on July 17, 2007, which depicted the relocated stream. The site plan illustrated the proposed new location for the stream, which will be repositioned by directing the water into a boulder-lined trough. Although no details on the work necessary to relocate the stream have been supplied to the Court, we presume that the existing stream bed would be disturbed, filled in and replaced with vegetation. The stream will be moved up to fifty feet from the existing channel so that it will arch to the north, away from the proposed house on the Northern Parcel. The relocation of the stream will place it within the Meadowland District.

10. Once the relocated stream flows beyond the envelope of the proposed house, it will separate into two branches. One branch will flow into the pre-existing, man-made pond that will now traverse the border between the Northern and Southern Parcels; the other branch will re-connect to the existing stream channel, north of the pond.

11. The site plan depicted the footprint of the proposed house on the Northern Parcel as being at least fifty feet from the relocated stream. However, the site plan also depicts two septic tanks on the Northern Parcel, approximately thirty feet from the relocated stream, within the fifty foot

---

[6] Regulation § 10.2 defines a stream as "[a]ny surface water course in the Town of Warren as depicted by the U.S. Geological Survey on topographic maps."

3

vegetated buffer. In addition, the mounds for the septic system—which will service the homes on both the Northern and Southern parcel—are depicted in the western section of the Northern Parcel, within the Meadowland District.

12. The DRB found that there will be no development taking place within the designated Meadowland District. Findings of Fact and Notice of Decision at 3.

13. Appellant owns residential property which abuts the northeasterly boundary of the Northern Parcel. Appellant's attorney, representing her interests, attended and participated in several of the DRB hearings concerning Applicant's proposed development. Following the DRB approval, Appellant timely appealed the DRB decision to this Court.

## Discussion

Applicant's conditional use and subdivision permit applications arrive at this Court after several changes to the project were suggested and then approved by the DRB. These changes involve relocating the stream, reformatting and moving the proposed house, including portions of the waste disposal systems inside the stream buffer, and calculating the road frontage by including the frontage on the shared driveway. In this de novo appeal, our rules of procedure direct our Court to apply the substantive standards that were applicable before the tribunal appealed from. V.R.E.C.P. 5(g); 10 V.S.A. § 8504(h). Thus, we will apply the laws and Regulations that were in effect during the DRB review, but will evaluate the applications now under appeal, including any site modifications, based upon the evidence the parties now present to this Court.

In this de novo appeal, summary judgment is appropriate only "when there are no genuine issues of material fact and, viewing the evidence in a light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." In re Carter, 2004 VT 21, ¶ 6 (citation omitted); V.R.C.P. 56(c). "[B]ecause of its severe consequences, summary judgment should be granted cautiously so that no one will be improperly deprived of a trial of disputed factual issues." Margison v. Spriggs, 146 Vt. 116, 118 (1985) (citation omitted). We review the pending motion in this light.

Appellant avers two general grounds in support of her request that we enter a summary judgment that Mr. Fowler's applications cannot be approved as a matter of law: first, Appellant contends that the proposed house and septic system in the Northern Parcel will encroach upon the fifty foot vegetated buffer for the stream and that the proposed stream relocation is prohibited

4

by Regulations § 3.13. Second, Appellant asserts that the subdivided parcels do not meet the required minimum road frontage as set forth in the Regulations. We will take each issue in turn.

### Relocated Stream

In the memoranda filed with this Court and during the course of the DRB hearings,[7] it was undisputed that the water course that crosses Applicant's property is defined as a "stream" under the Regulations. Therefore, it appears undisputed before this Court that the Regulations that pertain to development in or near a stream apply to Applicant's proposal.

Through its Zoning Regulations, the Town of Warren has expressed a desire to prevent soil erosion, protect wildlife habitat, and maintain water quality by requiring that "a vegetated buffer strip shall be maintained for a minimum of 50 feet from all . . . streams. . .." Regulations § 3.13(A). The vegetated buffer strip is to be measured from the top of the stream-bank and "[n]o development, excavation, landfill or grading shall occur within the buffer strip, and vegetation shall be left in an undisturbed state . . .." Id. This language establishes mandatory restrictions in clear and unambiguous language. Such regulatory language cannot be ignored. See In re John A. Russell Corp., 176 Vt. 520, 523 (2003) (mem.). While there are several exceptions to the restriction on clearing and site development within the vegetated buffer, they are specifically limited to site work that will provide site access and recreation paths or that will stabilize the stream-bank. Id. Thus, we conclude that Regulations § 3.13(A) applies to Applicant's site plans.

As the DRB concluded, Applicant's original site plan—which depicted the proposed house in the Northern Parcel located several feet from the stream and within the vegetated buffer—did not comply with this Regulation. Thereafter, rather than relocating the proposed house, Applicant proposed to relocate the offending stream to the north and to modify his site plans to so reflect.

Before determining whether the location of the proposed house sufficiently respects the vegetated buffer for the relocated stream, we must first determine whether the Regulations authorize Applicant to relocate a stream for the purpose of respecting a fifty-foot buffer from it. Our review of the Regulations finds no authority for relocating a stream and, in fact, includes specific prohibition of the activities necessary to relocate a stream.

---

[7] Initially, the Applicant's Engineer asserted that the water course was man-made in 1996 when the pond on the property was created. However, the Engineer later discovered that a USGS map had a blue line—which represents a stream—in the vicinity of the water course.

5

Applicant contends that the relocation of the stream is permitted under the municipal Regulations and the state statutes. We decline to consider the applicability of state statutes that may authorize or exempt from state regulation the stream relocation Applicant proposes, since no determination under state law has been preserved for our review in this appeal. We must consistently exert the discipline of declining to render opinions on legal questions not yet brought before us, as such opinions would be advisory only. In re Appeal of 232511 Invs., Ltd., 2006 VT 27, ¶ 19, 179 Vt. 409, 417. This caution is, in part, a practical one, since deciding a case not squarely before it causes a court to rely upon an undeveloped record. Id. at ¶ 18. Thus, while the DRB below discussed the need (or not) for a state stream alteration permit, we decline to address that issue, as we are not aware of any such determination having been made and have no such determination on appeal now pending in this Court.

What has been preserved for our review in this appeal, via Appellant's Question 2, is whether Regulation § 3.13(A) specifically prohibits the stream relocation Applicant now proposes. That Regulation specifically prohibits "development, excavation, and fill or grading . . . within the [50-foot stream] buffer strip . . .." Regulation § 3.13(A). Applicant has not provided us with details on the specific site work to be performed in relocating the stream, but from what limited information can be gleaned from Applicant's revised site plan, we conclude that the stream relocation will include the following work, all within the existing stream or its fifty foot buffer: excavation, filling in of the existing stream bed, digging the new stream bed and lining it with rock and other material, constructing a new channel for some of the stream water to flow into the pre-existing pond, and grading and seeding of the area where the stream once ran. We conclude that all of these activities are prohibited by the specific and mandatory language of Regulations § 3.13(A).

Some additional work that Appellant proposes within the stream buffer provides an independent basis for our conclusion that his revised site plan is in conflict with Regulations § 3.13(A). Specifically, Appellant proposes to locate the septic tanks on the Northern Parcel within the fifty foot vegetated buffer—even when measured from the relocated stream. In the site plan, last revised on July 17, 2007, the two septic tanks for the proposed new house are located approximately thirty feet from the relocated stream, which is within the fifty foot vegetated stream buffer. The placement of septic tanks within the vegetated buffer will

6

necessarily require excavation, grading, and will disturb the existing vegetation, all of which is contrary to the mandates of Regulations § 3.13(A).

The revised site plan also depicts the septic mound[8] for both parcels as being located within the Meadowland District, in the western corner of the Northern Parcel. The construction of a septic mound will necessarily require soil disturbance, excavation and grading, and will constitute development[9] within a primary conservation area[10] of the Town. This proposed activity conflicts with the directive in Regulations Table 2.13 that for lands within the Meadowlands District, "[n]o land development or land use, other than agriculture or forestry, may be issued a zoning permit . . . until the [DRB] grants conditional use approval in accordance with Article 5." We note that Applicant has not submitted any evidence upon which we can assess his proposed development's compliance with the conditional use review standards of Regulations § 5.13. Thus, we have no foundation in the record before us for compliance with the applicable regulatory standards.

Lastly, we note that the revised site plan depicts the proposed house on the Northern Parcel as being located within 100 feet from the stream—in its original or relocated position. Under the Regulations, "[n]o building or structure is allowed within 100 feet of any stream . . . without conditional use approval" by the DRB, which shall also find that the structure will not have an undue adverse impact upon the water carrying capacity, the water quality and the natural beauty of the stream. Regulation § 3.13(B). Our review of the record provides no evidence that the DRB considered this issue.

Although the proposed house will be located within 100 feet of the stream—in its original or relocated position—Appellant has also failed to provide us with any evidence upon which we could conduct a conditional use review of his proposed new home and its impact upon this stream. When we review an application prior to trial, due to an opponent's filing of a motion for summary judgment, an applicant has a duty to respond with some evidence upon which this Court could base a conclusion that the application conforms with the applicable zoning

---

[8] We understand that a septic mound is usually constructed from off-site sand and other material, so that an acceptable leach field may be installed in an area that would otherwise not meet minimum percolation requirements.

[9] Article 10 of the Regulations defines "development" (with reference to the term "Land Development") as including "any mining, excavation or . . . changes in the use of any . . . land or extension of the use of land . . .." Thus, we cannot mirror the DRB's conclusion that the installation of a mound-based waste disposal leaching system does not constitute "development."

[10] Regulations § 7.3(B) provides that "primary conservation areas shall include all lands within the . . . meadowland overlay districts . . .."

7

provisions.  In re Rivers Dev. Con Use Appeal, et al., Docket Nos. 7-1-05, 68-3-07, 183-8-07, 248-11-07 Vtec, slip op. at 8 (Vt. Envtl. Ct. Jan. 11, 2008).  One who fails to do so runs the risk of having their application summarily denied.  Id. at 9–10.  Because we have no evidence before us upon which we could base a conclusion that either the septic mound or new house location conforms with the conditional use review standards, we must conclude that the pending applications must be denied as a matter of law.

### Road Frontage

While our above conclusions are dispositive of the pending applications, we believe it important and necessary for our review to include an analysis of the legal issue of how the road frontage minimum may be satisfied.

The proposed subdivision will be located in the Rural Res. District, which has a minimum lot frontage requirement of 200 feet.  Regulations Table 2.2.  The existing parcel complies with this Regulation, as it has approximately 247 feet of frontage on Senor Road.  However, the subdivided parcels will have only 133 feet and 114 feet, respectively, of frontage on Senor Road.  The fact that the subdivided parcels did not meet the minimum frontage requirement is an impediment to permit approval because "[n]o lot shall be so reduced in area that it cannot conform to . . . frontage . . . and other dimensional requirements as prescribed in these regulations…."  Regulations § 3.7(C).

Although the subdivided parcels apparently did not meet the road frontage requirement, Applicant adopts the DRB's assertion "that frontage can be figured along both the road and a right-of-way."  Applicant asks that we adopt this conclusion, since he does not dispute the DRB's conclusion that "[t]he frontage requirement of 200 feet cannot be met entirely on Senor Road[, but that the Regulations allow for road frontage to be] calculated using the 50-foot right-of-way for the shared access in addition."  Findings of Fact and Notice of Decision at 1-2.  Our review of the Regulations leads us to an opposite conclusion: that the edges of the shared easement for a new common driveway does not constitute "road frontage" for purposes of satisfying the minimum frontage requirements for the subdivided lots.

"Frontage" is defined as "[t]he distance of the portion of a lot line abutting a road right-of-way."  Regulations § 10.2.  Here, the only proximate road is Senor Road.  Thus, without another measuring stick—or in this case another road right-of-way—it is undisputed that the subdivided parcels do not comply with the minimum frontage requirements.

8

Applicant asserts that the Regulations provide some leeway in § 3.1(D), which states that "[f]rontage requirements for parcels served by private rights-of-way that are a minimum of 50 feet in width shall be the same as the requirements for parcels served by public rights-of-way." Therefore, the Applicant contends that the Regulations also authorize frontage to be measured along a private right-of-way, so long as the private right-of-way is at least fifty feet wide.

However, when read alongside the definition of "frontage," § 3.1(D) does not provide for frontage to be measured along any access to the property—such as a driveway—unless the access is also a road right-of-way. The issue we must now determine then is whether the shared driveway Applicant proposes can be considered a "road right-of-way" for purposes of calculating frontage in the Town of Warren. We conclude that it cannot.

The site plan for the subdivision depicts a shared driveway to serve as access for both parcels, a small portion of which travels over a common easement; the shared portion of the easement will be approximately thirty to thirty-five feet in length before the driveway branches to each residence; the shared easement is about fifty feet in width where it abuts Senor Road. Here, this short shared access is a driveway, which is defined in the Regulations as "[a] minor, private travel way serving up to three adjoining parcels, which provides access for vehicles to a parking space, garage, dwelling or other structure."[11] Regulations § 10.2. Thus, the shared driveway is not included in any definition contained in the Regulations for a "road right-of-way." We therefore cannot see a basis for counting the short length of Applicant's shared driveway easement when calculating road frontage.

Applicant has not directed the Court to any authority from the Regulations sanctioning the inclusion of frontage along a driveway in any calculation of road frontage. Frontage is defined as the distance of a lot line measured along a "road right-of-way." We also note that Applicant has not presented the Court with the resulting measurements for frontage along the driveway. That is, there is no indication of where the asserted "road frontage" would start or end along the shared easement or driveway. Were we to adopt Applicant's interpretation, we fear that it would lead to a nullification of the minimum road frontage requirement for subdivided lots, as any shortage could be made up with a design that incorporates one or more shared

---

[11] The various definitions for "road" in Regulations § 10.2 do not include driveways. A "private road" is defined as "[a]ny road or street, and associated right-of-way, which is not publicly owned and maintained"; a "public road" is defined as "[a] road or street which is constructed within the boundaries of an officially deeded or dedicated and accepted public right-of-way"; and a "development road" is defined as "[a] private road that provides access to four or more parcels."

9

driveways.  When challenged to interpret zoning regulations, we are directed to read the regulations as a whole and so that no material portion is nullified.  <u>Murdoch v. Town of Shelburne</u>, 2007 VT 93, ¶ 5.  We therefore conclude that the Regulations do not allow for the length of a shared driveway easement to be counted as road frontage.

### **<u>Conclusion</u>**

For all the reasons more fully discussed above, we **GRANT** Appellant's motion for summary judgment and, in doing so, **DENY** Applicant's application for subdivision and conditional use approval, as we have concluded that, even when viewing the material facts in a light most favorable to Applicant, he is lacking a factual foundation for the legal conclusion that his applications can conform with the applicable Regulations.

This concludes the proceedings before this Court in this appeal.  A Judgment Order accompanies this Decision.


Done at Berlin, Vermont this 22nd day of July, 2008.


_____
Thomas S. Durkin, Environmental Judge